And will the lawyers for the parties please approach. And as soon as we all get up here, please tell us who you are, who you represent, and then we'll talk about who's going to argue. Good morning, Your Honor. Jason Fry, on behalf of Hennessy Industries. Good morning, Your Honor. Adam Budesheim, on behalf of Hennessy Industries. Good morning, Your Honor. Eileen King-Bauer, on behalf of Apple League Continental Casualty Company. Good morning, Your Honors. I'm Robert Anderson. I represent Allstate Insurance Company, a successor to Northbrook. And good morning. David Butler, on behalf of American Home Insurance. Okay. And I assume between Mr. Fry and Mr. Budesheim, one of you is going to argue? Yes, Your Honor. Okay. Mr. Fry will argue for Hennessy. And what about for the insurance companies? We have three different parties that are Apple Leagues in this case, Your Honor. So beforehand, we had agreed that I would take the lead in the argument and take about nine minutes, and then Allstate's counsel would take four minutes, and Mr. Buttman would like two minutes for his argument. Okay. And Mr. Fry? No, Mr. Budesheim. I'm sorry, Mr. Budesheim. Fifteen minutes, sir? I guess. Okay. Do I need to reserve time for a moment, Your Honor? Sure. We'll give you a few minutes for a rebuttal. Thank you. All right. So whenever you're ready. Good morning. My name is Adam Budesheim, and I represent the appellant, Hennessy Industries Incorporated in this matter, at the court's review. Before we – will you just take a minute, and maybe, Ms. Kingbauer, we talked about telling the students what the case is about. Just turn around and tell them what you're going to be talking about. Okay. Very briefly, this case, my client, Hennessy Industries Incorporated, they manufactured products many, many decades ago, and there are a number of people who claim that they were injured using these products, that when using them, they got exposed to chemical asbestos, which you may have heard of, which is a very dangerous substance that used to be used in a lot of machinery. It doesn't get used anymore today, and so many years ago, people would get exposed to asbestos, and a couple decades later, they might get sick from that. So a number of lawsuits were filed against Hennessy, arguing that we used Hennessy machines, and because we used them, we were exposed to asbestos, and we got sick from that. Hennessy bought insurance policies to protect it if it got sued, and so when it got sued in these cases, it turned to its insurance companies and asked them to defend it in the lawsuits, and to pay for any judgments that a court would have to reinvent or any settlement that they may have. And the insurance companies in Hennessy, they had disputes over how much coverage the insurance policies had to provide for them, and that's the issue we're dealing with here today. There have been several hundred, several thousand, actually, lawsuits filed against Hennessy, and the insurers argue all those lawsuits arise from one occurrence, and the occurrence is an insurance term that essentially is the accident or the event or whatever it is that actually caused injury to certain people who are now suing. Hennessy says that actually there were many different occurrences, that each place where somebody got injured is a separate occurrence, and the insurers argue all of them are one occurrence. And that's the issue we're arguing about here is the insurance policy, what does it say, and how does it require the number of occurrences to be determined. All right, Ms. Kingbauer? As counsel indicated, this is a case where the parties had disputes over how much insurance was available for a specific claim that had been filed against Hennessy. It was the Bouchant Claim. This case has been in litigation in the court system for a very long time. We've had a lot of disputes about how much insurance might be available and what insurance companies have to pay. So the policies we have here start way back in the 1960s, and they weren't effective until the mid-1960s. We had a lot of different issues that were resolved before we passed this point today. What we are asking the court to do today is to look at cases that this court, the Appellate Court and the Illinois Supreme Court, have decided on a similar issue. So you'll hear us talk about the number of occurrences, and we are going to argue to the court, there are other cases that the court looked at on this issue and decided those cases in the way that we think the court should decide today. So in terms of the process, that has been the process that we are asking the court to follow. We are asking the court to look at other cases that have decided the number of occurrences issued and decided in the same way today. You're going to hear us talk about cases from the Illinois Appellate Court and the Illinois Supreme Court and why the facts of our case are similar or the same to the facts of those cases and what apology language in our case is the same or not discernible from those cases. And as a result, we are going to ask the court to rule in all our cases. All right. Thank you both for that. And now, Mr. Budesheim, whenever you're ready. Thank you, Your Honor. The issue today before the court is Hennessey's appeal of the circuit court's ruling that all of the asbestos claims arise from a single occurrence. Hennessey believes the circuit court made that ruling in error. The issue here turns entirely on the language of the policies. It is undisputed Illinois law that the language of the policies controls this issue. One of the seminal cases on the issue, U.S. Gypsum Company versus Admiral Insurance Company, the case that the insurers discuss at length in their briefing, in that case when the court began its analysis of the number of occurrences issue, it said we first must look to the language of the policies. And that's what Hennessey asked this court to do. And we feel it is something the circuit court did not do. The circuit court's analysis of the language of the policy was essentially one sentence saying, I don't think it applies the way Hennessey does, and offered no analysis of that language. I haven't seen this clause in many policies, and I haven't seen many cases talking about it. Are there any? There are cases that talk about it. There aren't any cases in Illinois that analyze the language. There are cases that reference it, but they don't actually analyze it. There are cases for other jurisdictions that do reference the language as well. I think pretty much every case in the country that analyzed the language was cited in one of the two sets of briefing in this case, and you're right, Your Honor, there are not that many. It is not very common language. It does definitely exist. I've seen it in other policies. It's not necessarily been the issue of dispute in those policies, but it is a standard terminology, just by far not the most common terminology used in definitions of number of occurrences. Is it possible that it's just because these are such old policies that, over time, the insurance companies have morphed into different language, but these policies sort of stayed the same because the origin was so old? The original policies were, what, back in the 50s and 60s? No, they were the late 60s into the late 70s. I believe it was 67 was the first of the policies with this language. But I don't believe it's an historical artifact. This language was used in these policies at the same time that other languages were being used, the language that was used in U.S. CHPSOM, and, in fact, the policies in U.S. CHPSOM are older than the policies that are at issue here. But in any event, the language in the policy is drafted by the insurance company. That is correct, Your Honor. So they write it for their own determination of risk. That is correct, Your Honor. And for that reason, the insurance companies need to be bound by the language that's actually in their policies, not language that is in other policies that other cases cite to. And that's one of the fundamental flaws in the insurer's argument, is they rely entirely on cases that don't analyze this language, that analyze different languages. But you just said there are very few cases that do analyze this language and none in Illinois. That is correct, Your Honor. So for us, it's an issue that hasn't been decided by the courts in Illinois. That is correct, Your Honor. What we're doing here is have to define what occurrence means, right? Correct. The key word is occurrence. How is that defined? And it's defined in the policy. And so now we have to try to interpret the words in the policy. Yes, Your Honor. Okay. Your opponents in their briefs say that the occurrence is neither the injury nor the location of injury and that you are wrong to say that. What's your response? My response is we don't say that, Your Honor. The insurers are misconstruing our arguments. The occurrence is either an event, according to the definition. We're not talking about an event here. No one argues that the exposure to asbestos was an event, as that term is used in the occurrence definition. Rather, we're talking about exposure to conditions. And in order for the conditions to be deemed to be one occurrence, they need to meet certain criteria, and those criteria are laid out in the definition. We do not argue that the claims are the occurrence or that the locations are the occurrence. What we do argue is that the definition requires, in order for these many hundreds and thousands of claims to be aggregated into a single occurrence, two criteria must be met, and they are spelled out in the definition. The first criteria is they must relate to substantially the same conditions. No dispute here. The exposure to asbestos is substantially the same conditions for all the claimants. The second criteria that appears in this policy but does not appear in many other policies is that those conditions must exist at or emanate from a premises location. So in order to be aggregated, they need to all be coming from the same premises location. So the insurers say that the premises location, for purposes of their policies, is where this equipment was manufactured by Hennessey. I don't believe the insurers actually make that particular argument, and I don't really believe there's been any basis or authority put forward to say that it's not the locations where these people were exposed, the exposure to conditions. They're saying that it's this equipment that caused the injuries that give rise to the claims, and all that equipment was manufactured by Hennessey. So just like U.S. Gypsum, who manufactured its asbestos-containing products, it should be deemed one occurrence. They do make that argument, but I don't believe that argument holds up when looked at in the context of the language of the policy. It would make no sense for the premises locations to be, I don't know, I guess Hennessey's headquarters at the time. I mean, they haven't specifically articulated what the premises location would be, but why have that language in there at all? It just wouldn't make any sense in this context. Why not just use the same language that appeared in U.S. Gypsum, where the premises location condition for aggregating exposures was not present? It only had the requirement that they need to be related to substantially the same general conditions, and that's the basis on which U.S. Gypsum was able to aggregate all these claims. Well, we have an additional condition here, and to argue that you look at it exactly the same way as U.S. Gypsum did is effectively to read that additional condition out of the policy and essentially rewrite for the insurers a better policy than the one that they wrote and sold to Hennessey. And the insurance company was being paid on the basis of the policy that they wrote. So the policy that they choose to write, since Hennessey is not in a bargaining position to change language, the policy that Hennessey and the precursor, AMCO, bought, they were paying premiums based on some bean counters, actuarial decision, what this policy is going to cost. And they knew what the language meant, and they priced it accordingly. Is that a fair statement? Yes, that is a fair statement, Your Honor. And I think that also connects to why the particular language at issue here makes sense for the type of business that AMCO was. AMCO was not a manufacturer of consumer products that might be dispersed throughout the entire country. And to make it clear, neither AMCO nor Hennessey used any asbestos in the manufacture of its own products. That's correct. It was only when those machines were used with somebody else's product that included asbestos that there was any risk of exposure to asbestos. I mean, if you use this brake grinder with a brake shoe that doesn't have an asbestos lining that had some other lining, there's no risk of exposure to asbestos. And that did happen in some uses of the AMCO Hennessey products. I'm sorry. Sometimes when, say, the Hennessey products were being used, in fact they were being used on products that did not have asbestos. So it was some did and some didn't. And, of course, everybody's worried about, you know, the people who suffered from the asbestos exposure, but we need to understand that the policy was written to cover the Hennessey products, and the Hennessey products were able to be used in many different ways. That is correct, Your Honor. And the operation of the Hennessey product was not impacted at all by whether or not the brake components that was being used with it, whether they contained asbestos. It just really didn't have any bearing at all. So the fact that some asbestos products could be used with it is not a reflection of Hennessey making an asbestos product or a product that is designed in a way that it will always expose its users to asbestos. That's just simply not the case here. But these were also very large pieces of machinery. They weighed hundreds of pounds. You didn't go down to your local Home Depot and pick one up. I mean, these were equipment for mechanics, auto repair shops. They were meant to stay in one place. You could move it, but it's not the type of thing like a hammer where you take it with you from job to job. It stayed in one place. So the premises location language makes sense for these types of products as well, for the types of things that AMCO was manufacturing at the time, in a way that, say, ceiling tiles that U.S. Gypsum was making wouldn't actually make sense. I mean, you're making, you know, possibly millions of ceiling tiles being installed in various places. They're essentially a consumer good. These were not consumer goods. Does that make a difference, whether it's a consumer good or a good for business? It doesn't directly make a difference in the policy, but I think what it does is illustrate that there is a reason why the language is different here. Now, if we have a- It really doesn't matter whether the language, the reason for the language being different. We just need to interpret the language. I'm sorry, I don't- We just need to interpret the language. Yes. The reason it's there, does it matter? Not directly for the interpretation, but I think it helps the court to understand that this language is not just- it's not just a difference of wording, that there's a real meaning behind the difference, and it actually does make sense why there would be difference and why this language needs to be treated differently than the language that is used in U.S. Gypsum and NICOR and United Conveyor and every other case that they cite, too. Well, let's use the language that they say. To me, this is the key in their brief. They say that premises clause is to consolidate claims, that is, bring them together, claims arising from a single cause into one occurrence. When that cause originates, so that means exists at or emanates from one location and then either reoccurs at the same location or spreads to others. That's how they're defining the premises clause. The spreads to others, I don't believe, is consistent with the language here. I mean, the espoused exposure at one location is not going to spread to another location. It would be a completely different machine at another location that would potentially result in exposure at that other location. And I do agree with the statement in Confidential's brief that the purpose of this clause is to essentially, I don't remember the exact wording, but to aggregate all the exposures at a premises location. That's exactly the point. So it's a single cause into one occurrence. When that cause originates, it exists at or emanates from at one location and then either reoccurs at the same location or spreads to others. It seems to me that's a helpful discussion for you, the way they presented it. Yes, and to a certain, I think there's, I would disagree a little bit with how they worded it. Like I said before, the spreading to other locations. We're taking the spreading out because we don't have the spreading here. Right. So if you take that out, then you would agree with their saying the principal purpose of the premises clause as they've stated. Do you want me to read it again? I'll read it again. No, I understand the language. I mean, it is, yes, I think the agreement is that the purpose of the clause is to aggregate exposures at a premises location. What they then attempt to do is basically they spread that to all other locations. They essentially take out the word in the policy that says each premises location or emanating from one premises location, and they effectively reinsert the word all so that exposures at all premises locations are a single occurrence. And that is essentially rewriting the policy and completely changing the meaning of what that clause says, and that's what the insurers do. So while there is agreement on the basis of what this clause does in that it aggregates exposures at a premises location, the insurers then stretch that definition, I think, beyond the breaking point to apply to all locations and effectively nullify the language that's in there, the language that separates it from U.S. Gibson and all the other cases. You're also arguing that we should not go down the cause test road because those cases don't apply. The cause test is an interpretive tool, and it's used to interpret language that needs further interpretation. I don't think there's any need for the cause test here. I think with the additional condition that exists in this policy that does not exist in others, that it doesn't want to establish what the root cause is in terms of the policy than the typical U.S. Gibson language would do. So the cause test to the extent it's used here, I think, would be to determine whether the exposures at a given premises location have a common cause. Because you could have these machines could say they were leaking toxic fumes, completely unrelated to the asbestos exposure. Well, that's another exposure to conditions at the premises, and the cause test would look at, well, what's causing the exposure that we're dealing with here, and that's the use with asbestos-containing products, nothing to do with the toxic fumes. So you can have multiple exposures at a given site that are completely unrelated to each other, which is part of why the definition says they have to be substantially the same general conditions, the exposures. But what it does is the aggregation aspect of this clause, it says that when you have a particular site and you have lots of people being exposed to asbestos, that at that site it is all one occurrence. And for purposes of this argument, Hennessey does not dispute that proposition. The question is whether it then spreads to all other sites where there are these machines being used and exposure to asbestos, and that's what the insurers try to do with it. And the cause test to the extent it's used here was, as I said, will be determined at a given site what is the cause of the exposure. It can't then broaden that to the entirety of all the exposures everywhere, because that would render that language in the policy essentially null and void, write it out of the policy. And that is directly contrary to the rules of contract interpretation in Illinois and just about every other state in the country, too. All the terms of the policy need to be given meaning. They need to be considered. They can't just be ignored. And the insurer's argument ignores that critical language here that makes as a condition for finding a single occurrence that the loss must exist at or emanate from a premises location. And the fact that it says in these policies, one says existing at or emanating from each premises location, the other says from one premises location, nobody's claimed that this makes a difference, so we're analyzing the same. But the conditions existing at or emanating from each premises location is one occurrence. If you find that all these asbestos losses are one single occurrence instead of one occurrence per premises location, you've taken that word each out of the definition. The insurance companies wrote that word in there. And the fact that you have a modifier in both policies, one says each, one says one, this was not some accidental unintentional inclusion of a word. I mean, this was planned to be in there, one premises location or each premises location. And so that's why the language of the policy dictates that there can be no fewer than one occurrence per premises location. You could still have more than one occurrence at a premises location. That's not an issue that's really here. That could be in other cases. But certainly for this case, with the asbestos exposures that we have here, there can be no fewer than one occurrence per premises location where the machinery was being used with somebody else's asbestos-containing products and exposing the operators of the machinery to asbestos. So I believe I'm out of time unless the Court has any other questions, and I can come back and rebuttal. We'll give you a few minutes and rebuttal. Thank you, Mr. Boudreaux. Thank you. Ms. King-Bauer. Good morning. Eileen Bauer on behalf of Continental Casualty Company. Every Illinois case that has decided the number of occurrences issued in the context of multiple claims arising from the manufacture and sale of a defective product have found that all such claims arise out of a single occurrence. What was defective about AMCO's equipment before it was used with an asbestos-containing brake shoe? It was defective because when the equipment was used for its intended purpose, i.e., to grind brake pads, it allowed asbestos to be emitted and to injure claimants. But if the customer used a non-asbestos-containing brake pad, it's not defective or dangerous, right? Right. But the claimants who used non-asbestos-containing brake pads are not the claimants who have sued AMCO in the underlying cases. So it's not unlike in United Conveyor where the lower heat systems did not contain asbestos. Those claims were not at issue. It's where the high heat systems in United Conveyor contained asbestos and allow asbestos to be emitted. That's what the underlying claims are about. But United Conveyor incorporated asbestos-containing materials into the conveyor systems that it designed for its customers. Correct. There's no asbestos-containing material in AMCO's brake equipment. That's correct. But it's still the injuries here are injuries that are claimed by individuals who used the equipment for its intended purpose with asbestos-containing products. None of the underlying claimants are claimants who used the equipment with non-asbestos-containing products. That's not what the underlying exposure is about. In applying the cause test, we need to look at what is the cause, what's the conduct that Tennessee's predecessor, AMCO Tools, engaged in that led to the underlying liabilities. The underlying liabilities are asbestos bodily injury claims. So it's because the individuals were exposed to a product that when used for its intended purpose, allowed asbestos to be emitted, they allege they contracted injury. So what does the language in the policy that defines an occurrence and says, all such exposure to substantially the same general conditions existing at or emanating from one premises location or each premises location shall be deemed one occurrence. What does that phrase, existing at or emanating from one premises location, mean if you're right that everybody who was exposed to using this equipment to asbestos is one occurrence? So why do we even mention premises? Right. I think it's important, Your Honor, to look at the entire definition of occurrence. Right now we have a two-sentence definition that we're looking at. The first sentence defines what the occurrence is. It's an event or continuous and repeated exposure to conditions which unexpectedly results in personal injury during the policy period. That language defines what is the occurrence. That language is really no different than the language this Court construed in the United Conveyor case and the Court construed in USG. So the occurrence here is the manufacture and sale of defective products by AMCO Tools. We have to look at the cause test in Illinois. Why do we have to look at the cause test? Because all those cases, every single one of them did not have this language, right? Just answer my question. Every case had the language that I just quoted, Your Honor, the first sentence. But we have a second sentence. Right. The key is not the first sentence. The key is the second sentence. Well, the key in determining what the occurrence is is the first sentence. No. Don't they both? They both sentences define the term occurrence. Both sentences are included in the definition. I agree with you. So both sentences define what an occurrence is. Right. So let me explain. The first sentence, the event or continuous or repeated exposure here, is what is the conduct that AMCO engaged in that gave rise to its liability? It manufactured and sold breaking equipment. That's what it did. It put it into the stream of commerce. AMCO Tools did not purchase the equipment, install the equipment, or do anything at a premises. All it did was manufacture and sell the equipment just like USG. In USG, they manufactured and sold asbestos-containing building materials. They didn't install them. They just sold them. And whoever purchased them and placed them wherever they placed them might be liable in these underlying cases for different reasons. But the manufacturer of the products, the conduct that gives rise to their liability, and the reasons all the cases in Illinois involve product liability claims against insurers find there's a single occurrence because the cause is the manufacture and distribution of the defective product. That's the conduct that this party was engaged in that gives rise to their liability. So if we apply, if I go to the second sentence now, all such exposure to substantially the same general conditions existing at or emanating from a premises location. The circuit court found that sentence doesn't apply. And the circuit court was correct because if the manufacture and sale of the product is the occurrence, which it is here, if you try to put that round peg into the square hole of the second sentence, it doesn't make sense because AMCO didn't do anything to create an exposure at a premises location. Someone else may have. The purchaser of the products may have. But AMCO tools didn't. All they did was manufacture and sell the products. Their conduct ended when the products went out into the stream of commerce. So your position is the second sentence doesn't mean anything. It doesn't apply in the context of this case. These are umbrella liability policies that incepted over general liability. How can you say that? It's a definition. Okay? So you're saying we're going to accept the first sentence and we're going to read out the second sentence. How do we do that under LMI contract law? LMI contract law, doesn't it provide that we have to look at both sentences? Does it? Yes. Right. So we cannot ignore the second sentence. You would like us to ignore the second sentence. I think you're briefed very well. Try to ignore the second sentence. But let's talk about the second sentence. To me, you win or lose on how we interpret the second sentence. I don't think you disagree with that. Do you? Right. If you interpret the second sentence to apply here. Haven't you already said that? When you say that the principal purpose of the premises, Deamer Clause, is to consolidate claims arising from a single cause into one occurrence when that cause originates, which you define as exists at or emanates from, which is the language in the agreement, at one location, and that then reoccurs at the same location. The word spreads to others isn't even in the policy. Your Honor, what we mean is that it has meaning, but it doesn't have meaning in every single case. Yes, it does, because it says one or each premises. Now, the question for us to determine is, because the policy doesn't define one premises location, is what does one premises location mean? So we now have gone down, and to me then, within that second sentence, the most important words are one premises location. And if one premises location means, as the appellant says, they win, and what you're saying is we shouldn't even look at it. That's what I thought I just heard you say. Therefore, if we don't look at it, you win, but I don't see you can. Tell me how under LOI contract law we can ignore the second sentence. We're not saying you shouldn't look at it, Your Honor. The definition of occurrence, even the first sentence, includes language that we're not applying to this set of facts. It results in personal injury or property damage or advertising injury. There's no property damage or advertising injury that took place with respect to the entire site. But there is here exposure to substantially the same general conditions existing at or emanating from. Would you agree to that? It says we're all such exposure, so it refers back to if the occurrence is such that it exists at or emanates from a premises location. In other words, if the conduct that the insured is engaging in, it gives rise to its liability, exists at or emanates from a premises location, then that clause applies. Here, AMCO tools didn't do anything to create an exposure at the premises. These policies provide product liability coverage. Well, they provide different kinds of coverages. They provide product liability coverage, which is exactly what we have here, product liability claims. It provides premises liability coverage. In cases like the Mason case, for instance, or in NICOR, for instance, where the courts find the conduct of the insured, what gives rise to the exposure in underlying cases is not an inherently defective product. It's something else. There is an exposure created on a premises. In Mason, the insured serves food at a restaurant. The conduct is emanating from a premises. That's when a clause like this could apply. But it doesn't mean that we're writing the clause out of the policy or that the clause is ambiguous or it has no meaning. It just means in the context of this set of claims, because there's no question that AMCO tools' conduct is limited to the manufacture and sale of products, that's why it's sued in these cases. Wait, wait, wait. The term shall mean an accident or a happening or event or a continuous or repeated exposure to conditions. And then it says all such exposure to substantially the same general conditions. So existing at or emanating from one premises. So every location where this equipment is housed is a location of an occurrence. No, Your Honor, because it confuses what the occurrence is. No. How can you confuse it when both sentences have to be made sense of, okay? Right? Both sentences can make sense because the first sentence defines what the occurrence is. And here it's no different than in United States gypsum and the United Conveyor because the cause test requires us to look at the reason the insured is sued in the underlying cases, what conduct did they engage in. AMCO tools was not at any premises. They didn't place these machines at any premises. Someone else did. Unless we follow the cause test, can we rule for you? I mean, it seems to me your argument is the cause test. And to me, all those decisions that have used the cause test, the second sentence is not part of it. And so there's a lot of difference between all the case law out there that you're talking about and this case where we have not decided this issue in Illinois with regard to what the definition is of one premises location. The only case in Illinois that the case we've cited is the John Crane case. We're not going to look at that one. Okay. But there's no discussion specifically of the argument that's being made here. But the finding that the language, the second sentence of the occurrence definition, would require a finding of multiple occurrences based on premises where claimants were exposed, really takes the cause test and just tosses it to the side. And what NICOR says is we can't, it says in order to determine the number of occurrences, we look to the cause test. We don't toss it aside. We have to apply it. Again, you're ignoring the language in those policies versus this policy. And we have to use the language in this policy. Unfortunately for you, the language in this policy is different. And so we have a second sentence that, you agree, is not present in all those cases where the cause test is used. Correct? The second sentence was not in USG. It was not in NICOR. Right. So that doesn't help us. We have to make sense of the second sentence. You make sense of the second sentence by not just isolating the second sentence. You read the definition of occurrence starting with the first sentence. So I guess the question is, how can you make sense of the first sentence of the definition of occurrence, which is applying the cause test and finding what the cause of the insurer's liability is and trying to make a finding that they're liable for creating something on premises where there's no facts to show that they were. It simply doesn't apply. So besides the fact that AMCO Hennessy's product themselves were not inherently dangerous and had nothing to do with asbestos at all, you want us to take your line of thinking and use the second sentence as a modifier of the first sentence. Well, a couple of things. The products were inherently dangerous because when they were used for their intended purpose, they allowed asbestos to be emitted. That can't be true, counsel, because when they were used for their intended purpose, they sometimes resulted in asbestos-related injuries, but they sometimes did not. So if they were inherently dangerous, it seems to me they'd be dangerous all the time, which they weren't by definition. First of all, the products were used when the vast majority of brake pads included asbestos. Yes, I understand that. And the question is, what is the basis for liability in the underlying asbestos cases? AMCO is not being sued because people use the equipment with non-asbestos-containing products. That's not the basis of their liability. It's a defective product because when it was used for its intended purpose, it allowed asbestos to be emitted. It's not unlike the household case. The household case, there was defective products. It wasn't an asbestos case, but because there was a defective plumbing system, the cause of the insurer's liability there was an inherently defective product. It doesn't have to contain asbestos to be an inherently defective product. When it's used for its intended purpose and it causes the injuries that form the basis of all of the underlying claims, it is a defective product. Well, then you just have to ignore the fact that it wasn't a defective product when it wasn't used with asbestos-lined brake shoes. So I don't think that's – I think that that's an inconsistent argument. But I think the bigger problem is that all of the cases that you've cited have different policy language, and this policy is unusual. Maybe it was a slip-up by some underwriter, I don't know. But there it is, and that's the language that you're stuck with, and that's the language that we're stuck with. And it is what it is. No one can change it. The company has been paying premiums based on this policy, and the insurance company gets to write it. Why wouldn't we hold it against the insurance company? Because it doesn't make sense. If you read the definition of occurrence and apply the tests that Illinois courts have applied, the only way to get the result that Hennessey is asking here is to, one, apply the effect test, because Hennessey contends that the occurrence is the continuous or repeated exposure to conditions by workers and mechanics using the brake equipment at premises. That's Hennessey's position. That is not the result of the cause test. That is the result of the effect test. It looks at the number of claimants and where they were. Hennessey did not engage in any conduct where those claimants were located. So it eliminates the cause test. It's the only case in Illinois that would eliminate the application of the cause test in determining the number of occurrences in cases rising under product liability. Beyond your nine minutes, I know Mr. Anderson and Mr. Bookman are anxious to get up here. Anything you'd like to finish up with? I will let Mr. Anderson go ahead. Thank you. Thank you. Thank you, Your Honors. May it please the Court. To Justice Pichinsky's point, I'd like to cite the court to the Rondon case 247, Caleb IV at 1367, where the court says that use of the Hennessey grinders inevitably and invariably caused harm to the mechanic who used it. This isn't a maybe, maybe not. This means that the person who used the grinder, every time he used it was exposed to asbestos dust and there was harm. Whether or not that person ultimately got sick or got a disease is maybe a different point, but every time somebody used one of these pieces of brake servicing equipment, they did get harm. So the product was inherently defective. But Hennessey isn't saying that every one of those people who was exposed is a separate claim. That's the effect test. They're not invoking the effect test. They're saying that you aggregate all the claims, as the policy says, at each or one premises to constitute one occurrence. I understand that, but our point is that the long line of cases in Illinois that says the continuous and repeated manufacture, sale, and distribution of a defective product involves one occurrence. Okay, so if that was the language of your policy, I'd be with you. It is. Your Honor, well, it is in the first sentence. It absolutely is. But do you want to talk about the second sentence?  It means something. Let's, please. Thank you. So the second sentence reads, all such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence. So there are two things. There can be conditions emanating from a premises. So I ask, one of these gas stations or one of these service stations where they have one of these machines, they're about this big, there's nothing emanating from the premises. Let's look at these words, the way we use them. There's no smokestack belching smoke. There's no drainpipe. No, let's use the word existing. Sure. There also, the second part, so we can agree on that. No, I'm not saying I agree, but I just. Oh, you want me to? I think we should. Sure. Yes, Your Honor. There must be a general condition existing at the premises. The service station, the gas station, one of these machines, there's no general condition existing at one of those premises. If you bring one of these machines and put them on the premises, there also isn't a general condition existing at the premises until you turn it on and use it. Okay? When you turn it on and use it, asbestos dust will fly and someone will get harmed. But that's not a general condition. That's a specific instance of someone using a defective product for its intended purpose. But the definition for conditions is you can't ignore what's said in the first sentence. Right. But this Court has for 30 years said that continuous and repeated exposure to conditions, that fits squarely into the occurrence definition. Continuous and repeated exposure to conditions, continuous and repeated manufacture, distribution, and sale of a defective product. So when they talk about a general condition existing at a premises, there is none. Well, let's ask you a different question. Yes, Your Honor. I want to write a policy that allows the insured to collect at every location where the equipment is housed. How would you write that sentence? If I were the insured, I would go to my broker and have a specific endorsement written. No, no, but why doesn't this absolutely do that? Isn't that the purpose of this sentence is to say all such exposure to substantially the same general conditions existing at each premises or one premises location shall be deemed one occurrence. That's exactly what this does. I understand that's what it says, Your Honor, but this contract read as a whole, this is an umbrella excess liability policy that writes over many risks, writes over auto policy, garage policy, host liquor liability, comprehensive general liability, premises operations coverage, products coverage. So the language has got to be expansive enough to entertain all sorts of risks of these policies for which the policy. There's no limitation. Is there anywhere in this policy regarding the second sentence? Is there any limitation on our interpretation of the second sentence anywhere in the policy? Common sense, Your Honor. Not common sense. Is there anything in the policy? Yes, the first sentence. Well, but the first sentence. And the interpretation of this court over 20 or 30 years. Okay. But, again, we're repeating ourselves, but the fact is we've never had the second sentence before us. And so the second sentence has to mean something and be read in tandem with the first sentence. It does mean something. It can apply. Here's a situation, a case at a site, Chicago Bridge and Iron down in Texas, okay? There was a situation where a local company went down and built a huge refinery down in Texas, and there was asbestos-containing material everywhere, okay? Pipe covering, block, and several different workers, I mean, hundreds of acres most likely, there was a general condition at the plant. People were being exposed to friable asbestos throughout the plant. That is a general condition for which this language fits with the glove. But it's not our situation here. Here we have somebody using a defective product in the gas station where there's not a general condition on the premises. There's just one location where a guy using a faulty piece of equipment is getting hurt. Well, that's the general condition. The general condition. I think that stretches the language pretty far, Your Honor, to call that a general condition. Do you have any case law to that? No, but I can. I mean, I'm just taking the words as they are. There's no case law the other way, not in Illinois or anywhere in the country where this language is being interpreted the way they asked this court to do it. Again, it's a question of first impression for us. So we need to look at the plain language, look at the dictionary, find out what these words mean, and use the plain language. Everybody agrees it's not ambiguous what those words mean. Sure. So we just need to find out what the dictionary says that those words mean. And then we're done. Would you agree? I would agree that courts often use dictionary definitions and we need to use the words the way people use them in life. Sure. But I would just dispute that there is a general condition existing at these premises. Again, not a sick building, not a situation where we have mold spores emanating through the air. That's not what we have here. We have just a defective product that one guy's using and one guy's getting sick. If you look at the reported decisions involving the underlying cases, these cases, the underlying cases do go up in various things. Every case is the auto mechanic. Just virtually every case that I've seen, I think 14 out of 15 were quite clear, it's the auto mechanic. It's nobody else on the premises generally being exposed to asbestos fiber. It's not a general condition, Your Honor. Thank you. Thank you. Mr. Butman, last but not least. Certainly not least, Your Honor. Thank you very much. David Butman on behalf of American Home. I'm here primarily to address the second issue raised in Hennessey's appeal, which was not, counsel did not spend time arguing that, but the second issue is in their briefing, and that has to do with whether the circuit court erred in denying Hennessey's motion for partial summary judgment as to the limits available under the American Home policy under a multiple occurrences scenario. And Judge Allen properly denied that motion as moot because it did not present an actual controversy. He didn't decide the issue. Judge Allen did not decide the issue, and he properly did not decide the issue. And for that reason, the jurisdiction of this court, as presented in our papers, is simply to determine whether or not Judge Allen's ruling on that was correct. And I believe it was correct. And I believe Hennessey also doesn't present a significant argument in opposition to that. Rather, at page 15 of Hennessey's reply, Hennessey concedes that, if this court is to reverse and find in favor of multiple occurrences, then there is an actual controversy as to whether the five-and-a-half-month policy extension to American Home should provide a full $5 million aggregate limit as though it was written for a 12-month, one-year period. So we would send it if we reverse. Then the issue would go back to the trial judge. That's exactly right. Otherwise, it's not before us, but the judge can make a decision if we affirm. That's exactly right.